**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
UNITED STATES OF AMERICA, for the Use
and Benefit of Keller Painting Corp., and
KELLER PAINTING CORP.

                  Plaintiffs,

        -against-

TORCON, INC. and TRAVELERS
CASUALTY AND SURETY COMPANY,

                  Defendants.
-----------------------------------------------------------X

**MEMORANDUOM OF**
**DECISION & ORDER**
12-CV-1061 (ADS)(ARL)

<u>**APPEARANCES:**</u>

**Law Offices of Marianne Candito**
*Attorney for the Plaintiff United States of America*
47 Riveriview Court
Oakdale, NY 11769

**Hannum Feretic Prendergast & Merlino LLC**
*Attorney for the Plaintiff Keller Painting Corp.*
11 Broadway Suite 300
New York, NY 10004
       By: John Edward Hannum, Esq., Of Counsel

**Peckar & Abramson, P.C.**
*Attorney for the Defendants*
41 Madison Ave, 20th Fl.
New York, NY 10010
       By: Scott G. Kearns, Esq.
          Bruce D. Meller, Esq., Of Counsel

**SPATT, District Judge**.

This case arises from a subcontract agreement entered into by the Plaintiff Keller Painting Corp. ("Keller") with the Defendant Torcon, Inc. ("Torcon") to provide painting services for a construction project at a federal government building.  On December 21, 2012, the Plaintiffs the United States of America, for the use and benefit of Keller, and Keller (collectively, the "Plaintiffs") commenced this action against the Defendants Torcon and Travelers Casualty and Surety Company ("Travelers") (collectively, the "Defendants").  The action seeks damages allegedly owed to the Plaintiff Keller for services performed under the subcontract and asserting claims for (i) breach of the subcontract, (ii) payment on a bond provided by Travelers, and (iii) unjust enrichment.  On January 28, 2013, the Defendants filed an answer to the Plaintiffs' complaint and asserted two counterclaims against the Plaintiffs for breach of the subcontract.

Presently before the Court is a motion by the Plaintiffs for summary judgment pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56 to dismiss the Defendants' counterclaims and a cross-motion for summary judgment by the Defendants pursuant to Fed. R. Civ. P. 56 for summary judgment on their counterclaims against the Plaintiffs.  For the following reasons, the Court denies both motions.

## I. BACKGROUND

Unless stated otherwise, the following facts are drawn from the parties' Rule 56.1 statements. Triable issues of fact are noted.

### A. Underlying Facts

#### 1. The NSLS-II and Specification 09904

In 2008, Brookhaven Scientific Associates, LLC ("BSA"), acting under an agreement with the United States government, submitted a request for proposal ("RFP") to construction

firms for the construction of the National Synchrotron Light Source II Ring Building ("NSLS-II") (Beatrice Aff. at ¶ 5.)  NSLS-II was designed to be a "new, state-of-the art, medium energy electron storage ring," which was "expected to have a broad impact on a wide range of disciplines and scientific initiatives."  (Id. at ¶¶ 3, 6.)

The RFP contained specifications for the materials to be used in the construction of NSLS-II.  (Id. at ¶ 9.)  Relevant to the instant case, Specification 09904 contains requirements for interior painting on the NSLS-II.  Section 3.1(B) of the specification, entitled, "Inspection," provides, in part, that "[c]ommencing . . . work in a specific area constitutes acceptance of surfaces, and responsibility for performance." (The Pls.' Mot. for Summ. J., Ex. A.).  Section 3.10, entitled, "Application – General," provides directions for the application of paint to interior surfaces.  In particular, Section 3.10(d) states, "Mix and apply [paint] as recommended by [the] manufacturer."

Section 3.13 of Specification 09904 is entitled, "Schedule – Interior Paint Systems." Section 3.13(F) states that for "Miscellaneous metals" a "[w]ater based urethane, gloss" paint is required in three different coats: (i) "First coat: Pro-Cryl  Universal Acrylic Primer, B66-310 Series"; (ii) "Second Coat: Hydrogloss Water Based Urethane Gloss, B65"; and (iii) "Third Coat: Hydrogloss Water Based Urethane Gloss, B65."  Although not mentioned by name in this provision, the parties agree that the all three coats of paint specified by this provision called for a brand of paint made by the paint manufacturer, Sherman Williams.

## 2. General Contract with Torcon and Subcontract with Helmark

On February 18, 2009, BSA entered into a general contract with the Defendant Torcon, a construction management firm, for the construction of the NSLS-II.  Pursuant to the general

contract, the RFP and associated documents, including Specification 09904, were incorporated in the general contract.

Torcon began negotiations with Helmark Steel, Inc. ("Helmark") to provide services related to steel and metal decking on the NSLS–II. The parties do not make clear the date or underlying circumstances of those negotiations.

On March 31, 2009, prior to entering into a contract with Torcon, Helmark submitted a request for information ("RFI") to Torcon related to "metal roof decking." In that document, Helmark asked, "[I]t is our understanding that all of the metal deck work is to be prime painted as part of our scope of work and finish painted in the field. Please confirm." (The Pls.' Mot. for Summ. J., Ex. C.) In addition, Helmark asked, "Can you please provide information on the required paint product for the metal deck, or are we to submit the deck manufacturer standard primer for review and approval?" (Id.)

On April 9, 2009, HDR Architecture/Engineering, Inc. ("HDR"), the master architect for the construction of the NSLS-II, responded with respect to the first question, "This is confirmed. [Metal deck work is to be] shop primed, field painted." (Id.) With respect to the second question, HDR responded, "For primer and paint, see section 09904, 3.13F. Please submit primer for approval as specified." (Id.)

**3. The Application of First Coat of Prime Paint by Helmark**

On April 29, 2009, Torcon entered into a subcontract with Helmark Steel, Inc. ("Helmark") pursuant to which Helmark was required to provide, among other things, "shop primer paint" for metal roof decking and structural components to be used in the NSLS-II. The parties agree that pursuant to this subcontract, Helmark was required to paint the metal roof decking in conformance with Specification 09904.

4

On May 15, 2009, Helmark entered into a subcontract with Vulcraft of New York, Inc. ("Vulcraft") to supply the metal decking and steel joists, which were to be prime painted by Helmark.

On June 4, 2009, Helmark submitted a "data sheet" to Torcon for approval of the primer paint to be used on the deck and joists. (The Pls.' Mot. for Summ. J., Ex. D.) The primer that Torcon submitted for approval was a grey coating made by "ArmorChem WC," a paint company manufacturer. (Id.) On June 17, 2009, Torcon reviewed the submittal and forwarded it to HDR for approval.

The parties agree that the use of ArmorChem paint deviated from the Sherman Williams paint called for by Specification 09904 § 3.13(F). However, on July 29, 2009, HDR stamped the submittal as approved and checked a box that stated, "No exceptions taken." (Id.) The stamp also included a notation stating that "[c]orrections or comments made on show drawings during the review do not relieve [the] contractor from compliance with the requirements of the drawing and specifications . . . ." (Id.)

Thereafter, Helmark delivered and installed metal decking to "Penants 1 through 5" of the NSLS-II. Helmark used ArmorChem, not Sherman Williams, as the first coat of prime paint on the metal decking. The parties agree that Helmark's use of Armorchem contravened Specification 09904 § 3.13(F) and constituted a violation of Helmark's subcontract with Torcon.

**4. The Keller Subcontract**

On October 13, 2009, the Defendant Torcon entered into a written subcontract with the Plaintiff Keller (the "Subcontract"). Pursuant to the Subcontract, Keller agreed to paint the second and third coats of prime paint on the metal decking, and Torcon agreed to pay Keller $1,705,650 for its services. (The Pls.' Mot. for Summ. J., Ex. E(1).)

Pursuant to Article 1, Keller agreed to comply with the terms and conditions of several documents, including: (i) the terms of the Subcontract itself, (ii) the general contract between Torcon and BSA and (iii) "[d]rawings, [s]pecifications and [a]ddenda" referred to in Rider B of the Keller Subcontract.

Article 2 of the Keller Subcontract provides that "[Keller] agrees that the material it will furnish, equipment it will use, and the work it will complete shall be to the full satisfaction, approval and acceptance by [Torcon], the [a]rchitect, and [Brookhaven]." In addition, Keller "acknowledged" that the "[g]eneral contract, its [s]pecifications, [d]rawings, [a]ddenda [contained in Rider B of the Keller Subcontract] . . . have been made available to [Keller] and that [Keller] has examined and read [those documents] prior to signing this contract."

Article 4 sets forth the conditions of payment under the Subcontract. In particular, Torcon is required to provide progress payments and the "balance of the contract price" "thirty days after the [g]eneral [c]ontract is completed and accepted." However, Article 5 states: "[N]o payment made hereunder, including the final payment shall be evidence of performance of this Contract . . . against any claim of [Torcon]; and no payment shall be construed to be an acceptance of any defective work or as a waiver of any of the provisions of this Contract."

Pursuant to Article 7, if Keller "fail[s] in the performance of any of the agreements or terms and conditions" contained in the Subcontract, Torcon can terminate the Subcontract after "two days written notice to [Keller]." In the event of termination, "[Keller] shall be liable for any excess cost of completion of work terminated or performed by [Torcon] or [Torcon's subcontractors] . . . and shall be entitled to no further compensation whatsoever in the event of complete termination of its unperformed portion of [the Subcontract]."

Article 9 of the Subcontract provides, "Should any modification be required in the work shown or described by the drawings or specifications, [Keller] shall promptly furnish to [Torcon] a detailed breakdown showing the difference in quantity and value of labor and material effected by [the] modification[.]"

Article 9 of the Subcontract further provides:  "Where work is required to be done and the parties cannot agree as to whether such work is extra work, or its valuation, the performance of such work shall not be delayed, but [Keller] shall proceed with the same upon written order of [Torcon].  The failure of [Keller] to proceed  . . . shall constitute a material breach . . . regardless of whether . . . [Keller] is correct in its contentions, it being understood that the progress of the work may not be delayed by any controversy between the parties."

Article 10 of the Subcontract sets forth the provisions relating to "extra work" done by Keller.  In particular, Article 10 states, "[Keller] shall make no claim for extra or additional work unless . . . done in pursuance of a written change order executed by an executive officer of [Keller]."  If Keller "claims any work directed to be performed by [Keller] involves extra or additional work, [Keller] shall, within three days after receipt of such direction and before the next ensuing payment and before proceeding [with the work], make written claim . . . giving in detail the basis of contention [that the order requires 'extra work'] and a detailed breakdown showing separately the additional cost of labor and material."  Upon a "written direction of [Torcon]," "[Keller] shall promptly proceed with such work, and should [Torcon] rule said work is not extra or additional, [Keller] must reserve its claim . . . by written protest given within three days after notice [by Torcon] to proceed."  However, if Torcon orders "extra work," Keller "shall charge either an agreed lump sum, or, at the option of [Torcon], the cost of said work plus ten percent."

Article 10 provides that even if "a dispute, controversy or question" arises "in the interpretation of any provision of this Agreement," "[Keller] agrees that it will not . . . stop or delay any work . . . required to be performed . . . pending the determination of such dispute or controversy."

**5. The Sherman Williams Manufacturing Product Data Sheet**

In addition to the terms of the Subcontract, the Defendants allege that Keller was also bound to follow the directions for applying paint that were contained in a manufacturing product data sheet for the Sherman Williams Hydrogloss paint that was to be used by Keller in applying the second and third coats of paint to Penants 1 through 5 of the NSLS-II (the "Sherman Williams' Data Sheet"). Although the Plaintiffs acknowledge receiving the Sherman Williams' Data Sheet, they dispute that it was incorporated into the Subcontract and that they were bound by it.

In particular, the Defendants rely on a section of the Sherman Williams' Data Sheet entitled, "Surface Preparation." (Id.) This section states, "Surface must be clean, dry, and in sound condition. Remove all oil, dust, grease, dirt, loose rust, and other foreign material to ensure adequate adhesion." (Id.) The section also contains a subsection, entitled "Previously Painted Surfaces," which states, "If in sound condition, clean the surface of all foreign material. Smooth, hard or glossy coating and surfaces should be dulled by abrading the surface. Apply a test area . . . If adhesion is poor, additional abrasion of the surface and/or removal of the previous coating may be necessary." (Id.) Under a separate section entitled, "Application Procedures," the document states, "[S]urface preparation must be completed as indicated." (Id.)

Another section of the Sherman Williams' Data Sheet entitled, "Recommended Systems," instructs the painter to "[a]lways check for compatibility of the previously painted

surface with the new coating by applying a test patch of 2 – 3 square feet. Allow to dry thoroughly for 1 week before checking adhesion." (Id.)

### 6. The Application of the Second and Third Coats of Paint by Keller

After the Subcontract was finalized on October 13, 2009, Keller began to apply the two finishing coats of Sherman Williams paint to Penant 1 of the metal decking.

Prior to beginning work on Penant 1, Keller was not told by Torcon, Helmark, or Vulcraft that the first coat of paint that Helmark had previously applied was Armorchem instead of the Sherman Williams paint called for in Specification 09904 § 3.13(F).

Keller did not perform "surface preparation" or "compatibility testing" prior to applying two coats of Sherman Williams paint to Penant 1 of the metal decking. (Keller Dep. Tr. 34:3–9; Gambert Dep. Tr. 40:19–41:5.)

### 7. The Adhesion Problems with the First Penant

After Keller had nearly completed applying the second and third coats of paint to Penant 1 of the metal decking, Torcon discovered problems with the paint.

On February 28, 2011, Michael Beatrice ("Beatrice"), Torcon's Quality Assurance Manager who worked on the NSLS-II project, sent an email to Dominick D'Antonio ("D'Antonio"), a vice president and chief engineer at Helmark, stating, "Adhesion tests were conducted late last week at Penant 1 to verify proper adhesion of the top coat finishes to the shop primer . . . [T]he results indicate the poorest measurable level of adhesion. After researching the many different variables which could contribute to this result it was discovered that a[] [request for information] called for a different shop primer than what was submitted and used[.]" (The Pl.'s Mot. for Summ. J., Ex. I.)

After discovering the adhesion problems, Torcon informed Keller and directed them to stop painting Penants 2 through 5. (Beatrice Aff. at ¶ 32.) The parties do not make clear when Keller was informed by Torcon of the adhesion problems.

On March 28, 2011, Bryan Peters, a Torcon employee working on the NSLS-II, sent an email to D'Antonio and others at Helmark stating that a representative from Sherman Williams had confirmed that Helmark had applied the wrong brand of paint to Penants 1 through 5 of the metal decking. (The Pls.' Mot. for Summ. J., Ex. L.) He further stated, "It is Torcon's position that these costs for the above work are the responsibility of Helmark." (Id.)

Similarly, in an April 21, 2011 email to D'Antonio, Peters stated, "As I noted in my previous message to you on 3/28[,] it is Torcon's position that this issue is Helmark's responsibility in full." (Id. at Ex. M.) In an April 27, 2011 email, Beatrice further advised D'Antonio of its position that Helmark's use of Armorchem was contrary to its contractual obligations to Torcon. (Id. at Ex. N.)

Though the precise date is unclear, Torcon later instructed Keller to apply two brands of paint to Penants 2 through 5 that would bond better with the ArmorChem paint than the Sherman Williams paint called for in Specification 09904. (Id. at ¶¶ 41–43.) In an April 27, 2011 email to D'Antonio, Beatrice stated, "Torcon has proceeded with an additional primer coat between the ArmorChem shop primer and the specified top coat Hydrogloss at Penant[s] [2] through Penant [5]. The entire cost associated with the application of this extra coating is being back-charged to Helmark. Additionally, all costs of remediation at Penant 1 will also be back-charged to Helmark Steel."

### 8. The Request to Remediate Work Done at Penant 1

The remediation of Penant 1 presented a more difficult problem than Penants 2 through 5. Keller had already applied the second and third coats of Sherman Williams paint to Penant 1. Because the Sherman Williams paint did not bond properly with the Armorchem paint, the three coats of paint did not properly adhere to Penant 1 and needed to be removed. (Beatrice Aff. at ¶ 42.) However, removal of the paint was made more difficult by the fact that BSA had already installed expensive and sensitive equipment on Penant 1. (Id.)

In an October 28, 2011 email to employees at Keller, Beatrice stated, "Thank you for meeting me Tuesday morning to review the field conditions at Penant [1]. As requested, Torcon will shortly submit a reasonably detailed scope of work from which Keller can extract estimates and submit a proposal . . . . I would like to see a proposal for this work by Friday October 28, 2011." (The Pls.' Mot. for Summ. J., Ex. Q.) However, Keller did not submit a proposal or agree to perform remediation work at Penant 1. (Beatrice Aff. at ¶ 43.)

Torcon hired L&L Painting Co., Inc. and SLC Construction Management Corp. to perform remediation work at Penant 1, which Torcon alleges cost $2 million. (Id. at ¶¶ 45–46.) Despite a disagreement with Keller regarding their work at Penant 1, Torcon paid Keller in full for the work that Keller performed on Penants 1 through 5.

### 9. The Expert Affidavit and Report

In support of their motion, the Defendants filed an affidavit and report submitted by their proposed expert, Dr. Kenneth Brown ("Brown"). (The Defs.' Cross Mot. for Summ. J., Ex. A.) Brown has "over thirty years of experience in the paint and coatings industry and a Ph.D. in organic chemistry." (Brown Aff. at ¶ 2.) According to Brown's report, Keller "should have known that the wrong primer paint was used on the decking and questioned that before

proceeding with application of the topcoats and completing the majority of Penant [1]." (Brown Aff., Ex. A, at 2.) Brown's opinion is based on (i) the text of Sherman Williams' Data Sheet and (ii) his belief that the color, texture, and gloss of the ArmorChem paint was noticeably different that the Sherman Williams paint called for by Specification 09904**.** (Id. at 3.)

Brown also opines that the Sherman Williams' Data Sheet and Specification 09904 required Keller to perform compatibility testing and surface preparation prior to applying the second and third coats of paint. (Id. at 2.) His opinion is based on his reading of those documents. (Id. at 4.)

## II. DISCUSSION

In its counterclaims, the Defendants allege that the Plaintiffs breached the Subcontract by (i) failing to perform compatibility testing and surface preparation prior to applying the second and third coats of paint to Penant 1 and (ii) failing to perform remediation work on Penant 1 that was requested by Torcon. The Court will address the Plaintiffs' motion and the Defendants' cross motion for summary judgment on those claims.

## A. Legal Standard

Pursuant to Fed. R. Civ. P. 56(c), a court may grant summary judgment when the "movant shows there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law." The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.'" James River Ins. Co. v. Power Mgmt., Inc., No. 12-CV-02706 (ADS), 2014 WL

5460548, at *4 (E.D.N.Y. Oct. 28, 2014) (Spatt, J.) (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986)).

If the movant successfully demonstrates that there is no genuine issue of material fact, then the burden shifts to the non-movant who must come forward with specific facts showing that a genuine issue exists.  <u>See</u> <u>Major League Baseball Properties, Inc. v. Salvino, Inc.</u>, 542 F.3d 290, 310 (2d Cir. 2008).

A genuine issue of material facts exists if '"a reasonable jury could return a verdict for the nonmoving party."' <u>Id.</u> (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).  In determining whether a genuine dispute of material fact exists, a court "must resolve all ambiguities and draw all justifiable factual inferences in favor of the party against whom summary judgment is sought."  <u>Buckley v. Deloitte & Touche USA LLP</u>, 888 F. Supp. 2d 404, 415 (S.D.N.Y. 2012) aff'd, 541 Fed App'x 62 (2d Cir. 2013).  However, a party "opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory" or "based on speculation." <u>Id.</u> (citations omitted).

Where, as here, the case involves a contract dispute, summary judgment is appropriate only where "the agreement's language is unambiguous and conveys a definite meaning." <u>Creative Transaction Corp. v. Monroe Allen Publishers, Inc.</u>, No. 01 CV 4383 (RCC), 2004 WL 60291, at *3 (S.D.N.Y. Jan. 12, 2004) (quoting <u>Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan</u>, 7 F.3d 1091, 1094 (2d Cir. 1993)); <u>accord</u> <u>James River Ins. Co.</u> 2014 WL 5460548, at *5 ("[W]here 'the sole question presented to the Court is the interpretation of a clear and unambiguous written agreement, the issue is one of law and may properly be decided by the

Court upon a motion for summary judgment.'") (quoting <u>Amin Realty, LLC v. Travelers Prop.</u> <u>Cas. Co.</u>, No. 05–CV–195 (RLM), 2006 WL 1720401, at *3 (E.D.N.Y. June 20, 2006)).

Whether a contract is "ambiguous" is a question of law determined by the court. <u>Diesel</u> <u>Props S.r.l. v. Greystone Bus. Credit II LLC</u>, 631 F.3d 42, 51 (2d Cir. 2011). However, the meaning of an ambiguous contract is a question for the fact finder. <u>Genon Mid-Atl., LLC v.</u> <u>Stone & Webster, Inc.</u>, No. 11 CV 1299 (HB), 2012 WL 1372150, at *5 (S.D.N.Y. Apr. 18, 2012) (quoting <u>Scholastic, Inc. v. Harris</u>, 259 F.3d 73, 82 (2d Cir. 2001)) (internal quotation marks and citations omitted).

Therefore, the first question for a court to address in resolving a motion for summary judgment on a contract question is "is whether the contract is unambiguous with respect to the question disputed by the parties." <u>Nouveau Indus. Inc. v. Liberty Mut. Ins. Co.</u>, No. 08 CIV. 10408 (CM), 2011 WL 10901796, at *7 (S.D.N.Y. Sept. 7, 2011) (quoting <u>Law Debenture Trust</u> <u>Co. v. Maverick Tube Corp.</u>, 595 F .3d 458, 467 (2d Cir. 2010)). "Ambiguous language is that which suggests more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." <u>Genon Mid-Atl., LLC</u>, 2012 WL 1372150 at *5 (quoting <u>E.R. Squibb & Sons, Inc. v.</u> <u>Lloyd's & Cos.</u>, 241 F.3d 154, 174 (2d Cir. 2001)) (internal quotation marks omitted).

Although a determination that a contract is ambiguous usually requires the court to deny summary judgment, the court may nonetheless grant summary judgment where "the extrinsic evidence illuminating the parties' intended meaning of the contract is so one-sided that no reasonable person could decide to the contrary." <u>Nouveau Indus. Inc.</u>, 2011 WL 10901796 at *8 (quoting <u>Compagnie Financiere De Cic Et De L'Union Europeenne v. Merrill Lynch, Pierce,</u>

Fenner & Smith, Inc., 232 F.3d 153, 158 (2d Cir. 2000)) (internal quotation marks omitted);

accord Topps Co. v. Cadbury Stani S.A.I.C., 526 F.3d 63, 68 (2d Cir. 2008) ("To the extent the

moving party's case hinges on ambiguous contract language, summary judgment may be granted

only if the ambiguities may be resolved through extrinsic evidence that is itself capable of only

one interpretation, or where there is no extrinsic evidence that would support a resolution of

these ambiguities in favor of the nonmoving party's case.").

## B. As to Whether Keller Was Required Under the Contract to Perform Surface Preparation or Compatibility Testing

The Defendants argue that the Subcontract unambiguously required Keller to perform

surface preparation and compatibility testing prior to applying the second and third coats of paint

to Penant 1. Since Keller concedes that it did not perform surface preparation or compatibility

testing, the Defendants argue that they are entitled to summary judgment on their breach of

contract counterclaim.

In so arguing, the Defendants rely on two provisions of Specification 09904, which the

parties agree they are bound by under the Subcontract. First, they rely on section 3.1(B) of

Specification 09904, which states that "[c]ommencing . . . work in a specific area constitutes

acceptance of surfaces, and responsibility for performance." (The Defs.' Cross Mot. for Summ.

J. Br., at 6.)

Second, the Defendants rely on Section 3.10(D) of Specification 09904, which directs the

painter to "[m]ix and apply [paint] as recommended by [the] manufacturer." (Id. at 6–7.) The

Defendants interpret this provision to incorporate and bind Keller to the Sherman Williams' Data

Sheet. (Id.) However, the Plaintiffs dispute that the Sherman Williams' Data Sheet was

incorporated into the Subcontract. (The Pls.' Opp'n Br., at 6.)

The Sherman Williams' Data Sheet instructs the painter to: (i) "[r]emove all oil, dust, grease, dirt, loose rust, and other foreign material to ensure adequate adhesion"; (ii) "[i]f in sound condition, clean the surface of all foreign material. Smooth, hard or glossy coating and surfaces should be dulled by abrading the surface"; (iii) "[a]pply a test area . . . . If adhesion is poor, additional abrasion of the surface and/or removal of the previous coating may be necessary"; (iv) "surface preparation must be completed as indicated"; and (v) "[a]lways check for compatibility of the previously painted surface with the new coating by applying a test patch of 2 – 3 square feet." (Beatrice Aff., Ex. D.)

The initial question before the Court is whether the Subcontract incorporated by reference the Sherman Williams' Data Sheet. Whether an extrinsic document is deemed to be incorporated by reference is a matter of law. <u>Sea Trade Co. v. FleetBoston Fin. Corp.</u>, No. 03 CIV. 10254 (JFK), 2007 WL 1288592, at *4 (S.D.N.Y. May 1, 2007). "Under New York law, an extrinsic document is deemed to be incorporated by reference only when the agreement specifically references and sufficiently describes the document to be incorporated, such that the latter 'may be identified beyond all reasonable doubt.'" <u>Id.</u> (quoting <u>PaineWebber, Inc. v. Bybyk</u>, 81 F.3d 1193, 1201 (2d Cir. 1996)); <u>see also</u> <u>Adam Developers Enterprises, Inc. v. Arizon Structures Worldwide, LLC</u>, No. 13-CV-261 (DLI), 2014 WL 4828816, at *3 (E.D.N.Y. Sept. 29, 2014) ("To incorporate a document by reference, New York law requires that the document be referenced beyond all reasonable doubt."); <u>Ward v. TheLadders.com, Inc.</u>, 3 F. Supp. 3d 151, 163 (S.D.N.Y. 2014) ("It is well established under New York law that '[t]he doctrine of incorporation by reference requires that the paper to be incorporated into the written instrument by reference must be so described in the instrument that the paper may be identified 'beyond all reasonable doubt.'") (quoting <u>Kenner v. Avis Rent A Car Sys., Inc.</u>, 254 A.D.2d 704, 678

N.Y.S.2d 213, 214 (1998)); <u>Shark Info. Servs. Corp. v. Crum & Forster Commercial Ins.</u>, 222 A.D.2d 251, 252, 634 N.Y.S.2d 700, 701 (First Dep't 1995) ("Incorporation by reference, of course, is appropriate only where the document to be incorporated is referred to and described in the instrument as issued so as to identify the referenced document 'beyond all reasonable doubt.'").

This standard is strict — courts have held that vague references in a contract to a general class of documents are not sufficient to incorporate an extrinsic document by reference in the contract. <u>Ward</u>, 3 F. Supp. 3d at 163 (granting a motion to dismiss and finding that a statement in the contract at issue — "may contain other terms and conditions" — was not sufficient to incorporate extrinsic representations into the contract); <u>see also</u> <u>Sea Trade Co. v. FleetBoston Fin. Corp.</u>, No. 03 CIV. 10254 (JFK), 2007 WL 1288592, at *4 (S.D.N.Y. May 1, 2007) (denying motion for summary judgment and finding that a separate document containing additional terms and conditions was not incorporated by reference into the contract because the contract only made reference to the general "regulations" and "rules" of the Bank and did not "expressly name the Terms and Conditions as the document that contained the applicable regulations"); <u>Shark Info. Servs. Corp. v. Crum & Forster Commercial Ins.</u>, 222 A.D.2d 251, 252, 634 N.Y.S.2d 700, 701 (First Dep't 1995) ("Indeed, the policy as issued gives every appearance of being a complete statement of the terms, conditions, and limitations of coverage and makes no obvious reference to any unincluded endorsement, much less one containing so critically important an exclusion from coverage.").

Here, the Subcontract does not make explicit reference to the Sherman Williams' Data Sheet. Article 2 of the Subcontract states that certain documents listed in riders are "made a part of this agreement." Rider A to the Subcontract lists Specification 09904 as incorporated in the

Subcontract but does not explicitly reference the Sherman Williams' Data Sheet. (The Pls.' Mot. for Summ. J., Ex. E.)

Section 3.10(D) of Specification 09904 directs the painter to "Mix and apply [the paint] as recommended by [the] manufacturer." This language does not identify any documents, let alone identify the Sherman Williams' Data Sheet. Such a vague allusion is insufficient to meet the "exacting standard" required to effectuate a valid incorporation by reference. See Ward, 3 F. Supp. 3d at 163 (finding language in a contract stating that it "may contain other terms and conditions" to be "nothing more than a vague allusion to general classes of documents that may or may not be identifiable let alone be incorporated, and was thus legally insufficient to effectuate a valid incorporation by reference.") (internal quotation marks and citations omitted); Intesa Sanpaolo, S.p.A. v. Credit Agricole Corporate & Inv. Bank, No. 12 CIV. 2683 (RWS), 2013 WL 4856199, at *4 (S.D.N.Y. Sept. 10, 2013) ("It is manifest that this condition is not satisfied with respect to the [extrinsic document] via the non-specific phrase 'other relevant agreement(s) setting forth the terms of the Reference Obligation.'"). Accordingly, the Court finds that the Sherman Williams' Data Sheet is not incorporated by reference into the Subcontract and therefore Keller was not bound by its terms under the Subcontract.

However, the Court notes that the Defendants have offered a plausible argument that the meaning of section 3.10(D) of Specification 09904 is ambiguous and may introduce the Sherman Williams' Data Sheet as extrinsic evidence at trial to clarify its meaning. See Catlin Speciality Ins. Co. v. QA3 Fin. Corp., No. 10 CIV. 8844 (LGS), 2014 WL 2990520, at *2 (S.D.N.Y. July 2, 2014) ("If, however, the language in the insurance contract is ambiguous and susceptible of two reasonable interpretations, the parties may submit extrinsic evidence as an aid in construction,

and the resolution of the ambiguity is for the trier of fact.") (citing State v. Home Indem. Co., 66 N.Y.2d 669, 495 N.Y.S.2d 969, 486 N.E.2d 827, 829 (1985)).

The Defendants also rely on Section 3.1(B) of Specification 09904, which states that "[c]ommencing . . . work in a specific area constitutes acceptance of surfaces, and responsibility for performance." However, this provision also does not make reference to surface preparation or compatibility testing. Indeed, the fact that beginning work "constitutes acceptance of surfaces," could plausibly be read to suggest that Keller was required to accept the surface of the metal decking as is and not to conduct any further compatibility testing or surface preparation.

To buttress their claims, the Defendants offer an affidavit and report of their expert. In his affidavit, Brown opines that Specification 09904 required Keller to perform compatibility and surface preparation tests prior to applying the second and third coats of paint to the metal decking. (Brown Aff. at ¶ 8.) However, Brown's opinion is based largely on the ambiguous language of Specification 09904 itself and the Sherman Williams' Data Sheet. Therefore, the report is not particularly probative, especially where, as here, the sole issue on summary judgment involves interpreting the meaning of a legal agreement. See Seal Tite Corp. v. Ehret, Inc., 589 F. Supp. 701, 706 (D.N.J. 1984) ("Opinion testimony without more, however, cannot defeat summary judgment, and this is certainly true where the sole disputed issue is the interpretation of a legal document.") Therefore, the Court declines to grant the Defendant's cross-motion for summary judgment on its counterclaim alleging that the Plaintiff breached the Subcontract by failing to perform surface preparation or compatibility testing.

However, because the Court finds the meaning of Section 3.10(D) of Specification 09904 is ambiguous as to whether Keller was required to conduct compatibility test and surface preparation prior to applying paint on Penant 1, the Court denies the Plaintiffs' motion for

summary judgment on the Defendants' counterclaim with respect to that provision. <u>Genon Mid-Atl., LLC v. Stone & Webster, Inc.</u>, No. 11 CV 1299 (HB), 2012 WL 1372150, at *5 (S.D.N.Y. Apr. 18, 2012) ("Because both interpretations are plausible and both parties offer competent witnesses to support their reading, I conclude that this portion of the . . . Agreement is ambiguous as a matter of law and a jury must resolve whether this contract requires the qualitative analysis envisioned by [the Plaintiff] or the quantitative examination contemplated by [the Defendant].").

## C. As to Whether Keller Was Required to Perform Remediation Work Under the Subcontract

The Defendants also assert that Keller breached the Subcontract by failing to perform remediation work at Penant 1 after Torcon requested that they do so. In particular, the Defendants argue that Articles 9 and 10 of the Subcontract required Keller to perform additional work when requested by Torcon. (The Defs.' Cross Mot. for Summ. J. Br., at 10.) It is undisputed that on October 28, 2011, Beatrice sent an email to employees at Keller asking them to submit a proposal for removing the second and third coats of paint at Penant 1. (<u>Id.</u>) Because Keller refused to do so, the Defendants argue that Keller materially breached the Subcontract. (<u>Id.</u>)

In response, the Plaintiffs argue that Keller had already completed work on Penant 1 and the remediation work requested by Torcon was therefore not part of the Subcontract. (The Pls.' Opp'n Br., at 6–7.)

Article 9 of the Subcontract makes clear that Keller was required to conduct "extra work" when requested to do so by Torcon — "Where work is required to be done and the parties cannot agree as to whether such work is extra work, or its valuation, the performance of such work shall not be delayed, but [Keller] shall proceed with the same upon written order of [Torcon]."

However, the Subcontract does not define "extra work." The Plaintiffs make a plausible argument that "extra work" applies only to extra work requested by Torcon during the course of Keller's performance and not to work requested after Keller had completed work on the Subcontract. Since Torcon made its request to Keller to conduct remediation work on Penant 1 approximately eight months after Keller had finished applying the second and third coats of paint on it, the Court finds that a jury could reasonably conclude that Keller was not requesting "extra work" but requesting new work which was not covered by the Subcontract.

Other provisions of the Subcontract do not clarify the meaning of "extra work." Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan, 7 F.3d 1091, 1095 (2d Cir. 1993) ("Although the parties dispute the meaning of specific contract clauses, our task is to determine whether such clauses are ambiguous when 'read in the context of the entire agreement.'") (citing W.W.W. Associates, Inc. v. Giancontieri, 77 N.Y.2d 157, 159, 566 N.E.2d 639, 640 (1990)) Article 10 states that if Keller "claims any work directed to be performed by [Keller] involves extra or additional work, [Keller] shall, within three days after receipt of such direction and before the next ensuing payment and before proceeding [with the work], make written claim . . . giving in detail the basis of contention [that the order requires 'extra work']." The fact that Keller had to make a claim for "extra work" "before the next ensuing payment" could reasonably suggest that Torcon could only make a request for "extra work" prior to Keller completing its performance under the Subcontract.

On the other hand, Article 2 provides that "[Keller] agrees that . . . the work it will complete shall be to the full satisfaction, approval and acceptance by [Torcon]." In addition, Article 5 states: "[N]o payment made hereunder, including the final payment shall be evidence of performance of this Contract . . . against any claim of [Torcon]; and no payment shall be

construed to be an acceptance of any defective work or as a waiver of any of the provisions of this Contract." Taken together, these provisions could plausibly suggest that even though Keller had finished painting Tenant 1 and it had been paid for its work, its performance was not yet complete because of the work required to remediate the paint adhesion issues at Penant 1.

Therefore, given that the meaning of "extra work" is subject to two plausible interpretations, the Court finds that this portion of the Subcontract is ambiguous at a matter of law, and the jury must resolve whether the Subcontract required Keller to perform work to fix the adhesion issues on Penant 1. Accordingly, the Court denies both the Defendants' cross motion and the Plaintiffs' motion for summary judgment on the Defendants' counterclaim for breach of contract which relies on this portion of the Subcontract. See Postlewaite v. McGraw-Hill, Inc., 411 F.3d 63, 67 (2d Cir. 2005) ("However, when the meaning of the contract is ambiguous and the intent of the parties becomes a matter of inquiry, a question of fact is presented which cannot be resolved on a motion for summary judgment.") (internal quotation marks and citations omitted).

### III. CONCLUSION

For the foregoing reasons, it is hereby:

ORDERED, that (1) Plaintiffs' motion for summary judgment dismissing the Defendants' counterclaims for breach of contract is denied and (2) the Defendants' cross motion for summary judgment on its counterclaims for breach of contract is also denied.

**SO ORDERED.**
Dated: Central Islip, New York
November 29, 2014

_/s/ Arthur D. Spatt_
ARTHUR D. SPATT
United States District Judge